THOMAS McCLANAHAN *v.* FRANCIS BERRY.

*In Chancery.*

This was an appeal from a decree of the Paris district court.

The suit had been brought in the supreme court for the district of Kentucky, and removed on the erection of the district into the State of Kentucky, to the court of appeals for trial, but not having been tried when the original jurisdiction of the court of appeals was taken away, it was again removed to the said district court.

Francis Berry, on the 15th day of January, in the year 1780, obtained from the commissioners the following certificate for a pre-emption of 400 acres of land, to-wit:

"Francis Berry, by John Haggin, this day claimed a pre-emption of 400 acres of land at the state price, in the district of Kentucky, lying on the Middle fork of Cooper's run, about one mile up the said fork, by making an actual settlement in March, 1779. Satisfactory proof being made to the court, they are of opinion that the said Francis Berry has a right to a pre-emption of 400 acres of land to include the above location, and that a certificate issue accordingly."

But before he could obtain a pre-emption warrant, he was taken prisoner by the British and Indians at Martin's station, on the 26th day of June, in the year 1780, and detained in captivity until some time in the year 1784.

His agent, on the 22d day of August, in the year 1787, entered the said complainant's pre-emption warrant with the county surveyor, in the following words, to-wit:

"Francis Berry enters 400 acres of land on a pre-emption warrant, No. 2,438, on the Middle fork of Cooper's run, about one mile up the said fork, including his improvement in the center of his survey, to run at the cardinal points."

Daniel Wilcoxson, on the 10th day of January, in the year 1780, obtained from the commissioners the following certificate, to-wit:

"Daniel Wilcoxson this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, lying about eight or nine miles from Bryan's station, on the dividing ridge between the big fork of Elkhorn and Cooper's run, a branch of

Licking creek, including a sinking spring, by settling in the coun-
try in the year 1777, and residing ever since. Satisfactory proof
being made to the court, they are of opinion that the said Wilcox-
son has a right to a settlement of 400 acres of land, to include the
above location, and the pre-emption of 1,000 acres adjoining, and
that a certificate issue accordingly."

And assigned the same to Thomas McClanahan, who on the 3d
day of February, 1780, entered the certificate with the county sur-
veyor in the following words, to-wit:

"Thomas McClanahan, assignee of Daniel Wilcoxson, enters 400
acres in Kentucky, by virtue of a certificate, lying about eight or
nine miles from Bryan's station, on the dividing ridge between the
big fork of Elkhorn and Cooper's run, including a sinking spring."

And having obtained a pre-emption warrant, entered the same
with the county surveyor on the 26th day of April, in the year
1780, in the following words, to-wit:

"Thomas McClanahan, assignee of Daniel Wilcoxson, enters
1,000 acres, by virtue of a pre-emption warrant, joining his settle-
ment on the dividing ridge between Elkhorn and Licking, about
seven miles from Bryan's station."

The said Thomas McClanahan, also, on the 20th day of Decem-
ber, in the year 1782, made the following entry on treasury war-
rant, with the county surveyor, to-wit:

"Thomas McClanahan enters 2,230 acres of land on two treasury
warrants, Nos. 7,725 and 7,731, adjoining his settlement and pre-
emption as assignee of Daniel Wilcoxson, on the dividing ridge
between Elkhorn and Licking, on the west side of said settlement
and pre-emption, beginning in his military line, and running with
the said military line, also with the settlement and pre-emption
line north or northward as far as will, at right angles to the west,
give the quantity required."

The appellee, who was complainant in the inferior court, alleged
in his bill that he made an actual settlement on the land he claims
in March, 1779, and was about to survey within the time prescribed
by law, but was forbid by the said Thomas McClanahan, who ob-
tained a legal title and prayed for a conveyance, etc.

The said McClanahan, in his answer, denied that the said Berry
had any improvement on the land he then claimed, and alleged
that the land for which the certificate was granted to him was
held by Thomas Whitledge, by virtue of a certificate for a settle-
ment and pre-emption granted to him by the commissioners.

McClanahan *v.* Berry.

He stated that, believing John Kellar's pre-emption of 1,000 acres to be a better claim than his, he purchased of John Craig and Robert Johnston, assignees of the said Kellar, seven hundred acres thereof, for which he has obtained a conveyance.

The following connected plat, No. 36, was returned in this cause, of which the following is an explanation:

*a b c d*, the complainant's pre-emption of 400 acres, as directed to be laid down by the district court. The Ws, McClanahan's settlement and pre-emption as assignee of Wilcoxson. W W M M, Thomas McClanahan's 300 acres on military warrant. The Ms, Thomas McClanahan's 2,230 acres on treasury warrant. The square figure with dotted lines, Thomas Whitledge's settlement. The parallelogram with dotted lines, Kellar's pre-emption. 1, John Verdiman's dwelling house. 2, a spring on the east side of the creek. 3, a spring on the edge of the creek, said by Thomas McClanahan to be Solomon Litton's spring. 4, a sugar tree claimed by Francis Berry as the place where he improved.

5, Strother's spring, shown by Francis Berry as the place where Solomon Litton improved. 6, Strother's dwelling house. 7, a sink-hole spring. 8, McGee's spring. 9, Grotz' spring. 10 to 11, the East fork of Cooper's run. 12, the head of the Middle fork of Cooper's run. 13, the head of the North or West fork of Cooper's run.

The following is a summary of the testimony :

John Haggin deposed, that he had been acquainted with Cooper's run from the year 1775 to that time.

That he had always heard the most noted branches of that run called by the names of the South fork, the Middle fork, and the West fork.

That what was known by the name of the Middle fork was that on which Strother lives.

That that branch obtained the name of the Middle fork until its junction with the West fork, and below the junction it was known by the name of Cooper's run.

That in the spring 1779, Francis Berry, being then at Riddle's station, requested him to inform him where he could get vacant land ; and he then informed him of the Middle fork of Cooper's run, as above described, and went with him and others to that fork, where he understood he made an improvement.

That, at the request of the complainant, he laid in his claim before the commissioners, and the Middle fork, called for in their certificate, was intended by him, by that location, to describe that branch of Cooper's run on which Strother lives, above the mouth of the West fork.

That when he put in the complainant's claim before the commissioners he was informed of Thomas Whitledge's claim, and supposed it lay on what he called Cooper's run, below the mouth of the West fork, and that he located the complainant's claim upon the Middle fork, above the mouth of the West fork, that their claims might not interfere.

That he hath never, from 1775 to this time, heard the branches of Cooper's run called by any other names than those mentioned above, and thinks it highly probable that he was instrumental in giving them these names, as he was among the first adventurers in that part of the country.

That he believes that Solomon Litton was in company with the complainant at the time he understood the complainant made his improvement on the Middle fork of Cooper's run, as above stated.

Solomon Litton deposed, that some time about the month of May, in the year 1779, he, together with the complainant, John Haggin, Richard Davis, George Lovelass, and several others, went from Riddle's station with the intention of making improvements to secure land.

That they struck a branch which John Haggin informed them was the Middle fork of Cooper's run, and that, after having having proceeded about half a mile up the said branch, the complainant, on the recommendation of the said Haggin, who informed him that if he improved there he would probably keep clear of other claims, got down and made an improvement.

That the said improvement consisted of a brush heap, or heaps, and the marking the two first letters of the complainant's name.

That they saw no spring at or near it, but expected to get water within the bounds of the land, as it was near the branch. That the company then proceeded up the branch, and he made an improvement for himself about half a mile up, on the left hand side, near where Thomas Strother now lives. That he was present when the claim was granted by the commissioners, and that it was granted for this improvement, and that it was the only one the complainant claimed. That the complainant, in the winter 1779, removed to Martin's station in order to make corn near the land.

Richard Davis deposed, that some time in the year 1779, he, in company with Francis Berry, Solomon Litton, John Haggin, Benjamin Cooper, and some others whose names he does not recollect, went from Riddle's station to improve lands. That the first improvement they made was for him, at a spring now called McGee's spring, on a branch of Cooper's run.

That they went from this spring through a part of what they understood to be Whitledge's claim, to a branch which is also a branch of Cooper's run. That when they came to this branch Haggin told Berry this was the land he designed for him, and told him to improve there.

That he asked why they would improve there when there was no spring at the place. Haggin told them not to regard a spring, they would find one afterward. Upon this Berry got down and blazed a white ash or hickory, but which of them he can not be certain, and cut the two first letters of his name and blacked them with powder, and cut down and threw together a few brushes.

That while Berry was marking this tree he sat down at the foot of a small sugar tree and chopped a hole with his tomahawk in the

root of it, and that at the place where Berry made his improvement the branch made a bend like a horse shoe. That he hath been in the neighborhood of this land since that time, but has never been at the improvement from the time Berry made it until last week; the tree on which Berry made the improvement was cut down, but the stump remained, but was in a very decayed state. But the sugar tree which this deponent chopped the root of, was still standing, and the mark of the tomahawk at the bottom of it was still perceivable, though it had grown up very much. That they then crossed the branch at Berry's improvement, and went up it, leaving the branch to the right hand, until they came to a spring, which he considered as the head of the branch.

That when they got to this spring Litton blazed a large ash tree, and put the two first letters of his name on the blaze with powder, and he is not certain whether he made any other cutting there or not. That the improvements which were made on that day were made with an intention and for the purpose of giving them a claim to land in consequence of such improvements. That the spring at which Litton made his improvement is in a field, and within about forty yards of Strother's house. That they supposed at the time that Litton made his improvement it was about half a mile from Berry's, but he now thinks it is hardly as far.

He is well convinced that the places seen by him last week, and described by him above, are the places on which Berry and Litton made their improvements at the time above mentioned; that he can not be certain as to the time of year the improvements were made, but thinks it was before Bowman went against the Shawnee towns. That he understood that Berry and others attempted to build a station at McGee's spring, and that he was not at the sitting of the commissioners.

Jezereel Ellis deposed, that he had been well acquainted with the Middle fork of Cooper's run, as also the place now claimed by Francis Berry, ever since the year 1784, which was before any settlement had been made up the said run.

That he was well acquainted with the place now claimed by Francis Berry, and never saw any sign of improvement at the said place. That in the summer 1785 he made that branch his road and hunting ground, and thinks that few trees passed his notice near the branch and place now claimed by Francis Berry, and that he was very particular in observing for landmarks as he went up and down said run. That he had heard of Francis Berry's claim,

and where it was said to have been proved by Richard Davis; he went on the ground, and near about one hundred yards above Robert Johnston's field or fence, and there carefully searched for the signs of improvement, as also the mark of a tomahawk in the root of a sugar tree, but could not find either. That he saw a sugar camp at the place, and sundry sugar trees chopped in the body as usual, but not one in the root, and they seemed to have been chopped with a large axe, and all at one time. That this place is on the Middle fork of Cooper's run, and about one hundred and fifty poles below the defendant Strother's house, and about two and a half miles, or three-quarters, above the mouth of the Middle fork, where it mouths with the East branch of Cooper's run.

Benjamin Cooper deposed, that some time in May, 1779, he, in company with Solomon Litton, Francis Berry, Richard Davis, John Haggin, and others, started from Riddle's station with a design of exploring the country and making improvements, and went to Cooper's run, and struck the same about the fork. That from thence they went up the left hand fork a small distance, and then the company parted, and that Solomon Litton, Francis Berry, himself, and some others, went up between two forks of Cooper's run to the dividing ridge between said run and Elkhorn, and thence crossed said ridge to Elkhorn. That he did not see Francis Berry make any improvement on the Middle fork of Cooper's run, nor Richard Davis at the Rocky spring, now called William McGee's. That neither Richard Davis or John Haggin were with them as they went up between the forks of Cooper's run.

Samuel Tharp deposed, that he had been well acquainted with the branch and place where Richard Davis, by his deposition, swore that Francis Berry blazed an ash tree or white hickory, and cut the two first letters of his name and blacked them with powder, in the year 1779. That he never saw any blaze on any tree at or near the said place, and the sugar tree sworn to by Richard Davis, in his opinion, had been chopped long since the year 1779, and that it was not in the root, as Richard Davis had sworn, and it appeared to have been chopped by a large axe, and not a tomahawk. Therefore, it was his opinion that Richard Davis' testimony could not be the truth.

Peter Moore deposed, that in the year 1785, and ever since, he had been well acquainted with the branch and place where Richard Davis, by his deposition, swore that Francis Berry blazed an

ash tree or white hickory, and cut the two first letters of his name and blacked them with powder, and that the sugar tree alluded to by the said Richard Davis he never saw any chop in until since Richard Davis' testimony, which chop he believed to have been made long since the year 1779, as sworn to by the said Richard Davis, and that the chop is not in the root, as Richard Davis set forth, nor did it appear to have been done by a tomahawk, but by a large axe, as plainly appeared. Therefore, he was of opinion Richard Davis' testimony could not be true.

Samuel Elgin deposed, that he was present at Lexington some time in September, 1795, where there was a land dispute to be determined between John Brown and Thomas McClanahan, and heard John Haggin called on by the said Brown to prove his entry and survey, and that the said John Haggin then made oath that he, the said Haggin, made John Brown's entry and directed the survey thereof, and that he entered the same on the head of Cooper's run, and that he always conceived the same to have been the main fork until lately.

That the entry and survey claimed by John Brown is where he now lives on that fork, which John Haggin now calls the West fork of Cooper's run.

Thomas Jones deposed, that about the 29th day of August, 1795, James Logan, who then acted as agent for Francis Berry, produced an order of survey from the Kentucky court of appeals, directing him, as surveyor of Bourbon county, to survey and lay off the lands in controversy between said complainant and said defendant, as either party should choose, and said James Logan conducted this deponent to that fork of Cooper's run that runs down on the east side of Thomas Strother's plantation, and on the west side of Thomas McClanahan, Jr.'s, house, and about one hundred and sixty poles below the defendant Strother's house, and showed him a sugar tree on the west side of said run, and he understood by said Logan that that was Francis Berry's improvement.

That he saw no chops in the root of the said sugar tree, but he saw a notch that had been cut in the body about sixteen inches from the ground, but there was no mark of an axe or tomahawk in any part of the roots perceivable. Some conversation passed between McClanahan and said Logan at the time, about the chop in the sugar tree, which made him search the roots of the said sugar tree with great care. That he saw several trees notched about the

same place, and stumps of trees that had been cut down which had the appearance of an old sugar camp.

That the chopping, both in the sugar tree showed to .him by said Logan and some other sugar trees within five or six poles of said sugar tree, was done with the same axe and about the same time. That he saw no appearance of any old improvement near the sugar tree showed him by Logan except an old sugar camp.

Edward Bradley deposed, that he knew nothing of Francis Berry's claim further than by his entry; that he is well acquainted with the Middle fork of Cooper's run; and that, in the year 1775 he came to this country (Kentucky), and that he made an improvement on the East fork of Cooper's run; and that Thomas Whitledge made an improvement on the Middle fork of Cooper's run, about half a mile up the said fork; and that, in the year 1779, at the court of commissioners for the district of Kentucky, Thomas Whitledge's claim was laid in by Richard Henderson, and .that he was then called on to prove the said claim; and that he then did consult with John Martin to know of him what he called the branch where Whitledge's claim lay, and that ho said it was the Middle branch of Cooper's run; and then he proved the same to be on the Middle branch of Cooper's run.

That the mouth of the Middle fork must be where it mouths with the East branch, and that it is about three miles below Thomas Strother's. That the Middle fork hath another branch coming in about one mile and a half up the said branch, which he called the Upper fork, and some called it the West fork; and if Francis Berry makes his survey above the said fork it must be contrary to the distance that he calls for by his location.

. Thomas McClanahan, Jr., deposed, that he had been well acquainted with the branch where Richard Davis swore that Francis Berry blazed an ash tree or white hickory, and set the two first letters of his name with powder.

That in the year 1787 he erected a sugar camp at the place, and that the white hickory stump, which he alludes to by his deposition, he had cut down for the use of the camp, and that there was not any blaze then perceivable, nor any letters, as he sets forth, and that the sugar tree standing by the white hickory stump, alluded to by Richard Davis' deposition is not cut in the root as he hath sworn, neither doth it appear to be chopped by a tomahawk, but by a large axe, and, he believes, some time since the year 1779, and that the testimony of Richard Davis could not be the truth.

The following entries and surveys were read in evidence, to-wit:

"September 19, 1780. John Brown, assignee, etc., enters 400 acres upon a treasury warrant, on the head of Cooper's run, on the dividing ridge between Elkhorn and Licking."

"December 2, 1785. Surveyed for John Brown, assignee, etc., 400 acres of land, situate on the head of Cooper's run, and on the dividing ridge between Elkhorn and Licking, including the head spring of Cooper's run in the center, by virtue of a treasury warrant, No. 1,324, and entered the 19th day of September, 1780. Beginning at A, an elm and sugar tree and blue ash trees, running from thence west, 253 poles, crossing two small branches of Cooper's run to B, a sugar tree, ash, and hickory; thence south, 253 poles, crossing two small branches to G, two hickory saplings and box elder on high ground; thence east, 253 poles, crossing three small branches to D, a hickory, ash, and walnut trees; thence north, 253 poles, to the beginning."

"September 19, 1780. John Haggin enters 500 acres upon a treasury warrant, on Cooper's run, a branch of Licking, to include a cave spring and his improvement, where he began to erect a station, and to join Benjamin Cooper's pre-emption on the north, and to run west from the spring for quantity."

"January 16, 1783. Surveyed for John Haggin, assignee of Samuel Bryan, 500 acres of land by virtue of a treasury warrant, No. 2,684, situate and being in the county of Fayette on Cooper's run a branch of Licking, bounded as follows, to-wit: Beginning at A, an ash, iron-wood and buckeye; running from thence east, 332½ poles, to B, a buckeye and two box-elders; from thence south, 240 poles, to C, an ash, buckeye, and sugar-tree; from thence west, 333½ poles, to D, a hickory and walnut tree; thence north, 240 poles, to the beginning."

At the March term of the district court, held in Paris in the year 1798, the following decree was pronounced:

BY THE COURT.—In this cause the court are of opinion, that the testimony exhibited by the complainant sufficiently establishes the spot described by him in his certificate of pre-emption.

It is therefore decreed, that his survey be made in the following manner: His pre-emption of four hundred acres shall be surveyed in a square with lines to the cardinal points, and including the improvement established by the complainant in the center; and as the location with the surveyor is in conformity to this opinion,

it is further decreed that the defendant convey to the complainant the land included within such survey and which may be within the survey of the defendant. Order of survey, etc.

And at the July term of the said court in the same year, the decree was made final, from which decree the defendant appealed.

And at this term the argument of this cause came on.

BROWN for the appellant.—I will commence the examination by an inquiry into Berry's right, for if his claim is substantiated, I admit it to be better than McClanahan's.

This claim was granted for making an actual settlement in the month of March in the year 1779, and of course to support it, the testimony must [prove the settlement to have been made at that time, and also the place where it was made.

I will first examine the calls of the certificate, for the entry with the surveyor not having been made until 1787, the certificate can neither be explained or aided by it.

I will be bold to say, that one mile above the mouth of the Middle fork of Cooper's run, is the only call in the certificate.

There is no call for the improvement, and it was settled in the case of *Bryan and Owings* v. *Wallace*, that a call to include the location was not a call for the improvement.

That this call is not supported will appear:

*First.* By a view of the plat.

*Second.* By the testimony.

The call for the distance will not answer, unless the mouth of the Middle fork is at the junction with the fork called by Haggin the West fork.

That is a middle fork which lies between two other forks, and from an inspection of the plat, it appears that the fork from the mouth of the East fork up, must be the Middle fork, for it lies between the East fork and Grotz' fork which is properly the West fork.

John Haggin is a solitary single individual to prove the other to be the mouth of the Middle fork, and the names he says, he was instrumental in giving the water courses.

And he contradicts himself by locating on what he calls the East fork, by the name of Cooper's run, by Brown's location; he is contradicted by Jones', Elgin's, and Bradley's depositions, and he is opposed by Whitledge's certificate.

From the mouth of the Middle fork to the improvement claimed by Berry is 800 or 900 poles, therefore, this only call is not established.

There is a great deal of testimony introduced to prove the improvement, but I conclude it can not be attended to, because it contradicts the certificate, and in this the case is like that of *Myers* v. *Speed.*

There are two witnesses to prove the making this improvement, and neither of them are deserving of much credit, Davis and Litton.

Davis recollects every thing, he went through Whitledge's claim, a village right then not located, heard a conversation with Haggin about the spring, cut a hole in the root of a sugar-tree, near a horse shoe bend, and then went up to Litton's improvement without crossing the branch.

In this he is inconsistent with Haggin, who knows nothing of the improving but only showed them the fork; with Cooper who went with Berry and Litton up between the forks, and says they made no improvement, and with the plat which shows he could not get up to Litton's improvement without crossing a branch, and the improvement was made in May when the waters were likely to be flush.

And as to the chop in the root, he is opposed by the testimony of Ellis and McClanahan, Moore, Tharp and Jones.

Litton's situation is such, Berry and he having swapped depositions, that little credit at all events would be given to him, but to his testimony there is the same objection as to Davis'.

BRECKENRIDGE for the appellant.—The *allegatæ* and *probatæ* in this cause do not agree. I do not mean to impeach the certificate granted by the commissioners, but to inquire where was the actual settlement made in March, 1779, for which it was granted.

The *allegatæ* is, that in March, 1779, they made an actual settlement, and the proof is that in May, 1779, a tomahawk improvement was made at this place. It is not McClanahan that impeaches the certificate but their own proof.

This kind of testimony can not be received : in *Consilla* v. *Briscoe* it was determined, that proof could not be received to contradict an entry, but to support it. And in the case of *Myers* v. *Speed,* the court said, because the proof did not agree with the certificate, that they would not presume the improvement to be the one for which the certificate was granted.

So here the court can never presume, that the commissioners granted the certificate upon the proof now produced; if they have an actual settlement made in March, 1779, let them show it.

Beside this, the improvement wanted that notoriety essential to the support of such claims.

MURRAY and HUGHES for the appellee.—There are three objections made to the decree of the district court. It ought not to have been given says the appellant.

*First.* Because the location is not established.

*Second.* Because the proof does not correspond with, but contradicts the certificate.

*Third.* Because the improvement was not notorious.

As to the first point John Haggin's testimony must be conclusive, he is a man of fair character wholly unimpeached, and supposes he gave the name to the water courses.

The proof produced to contradict him, only shows that he has in his own location and on another occasion called a branch of Cooper's run, Cooper's run.

There is nothing improper in this, for although the branches had particular names, they were all Cooper's run, and calling for them by the general description does not prove that they had not at that time a particular name.

But the plat itself shows, that to the mouth of the West fork is properly the main fork, and it is proved also by the evasion of the answers calling it above the mouth of the West fork, the upper fork.

Davis and Litton identify the spot, and there is nothing to impeach the credit of either. Davis swears he made a small chop in the root of a sugar tree, and to contradict it, McClanahan shows one of the chops in the body of a tree made at a sugar-camp; this is certainly not the chop of which Davis speaks, nor is it strange that the kind of mark made by him could not be seen by the other witnesses, they perhaps never examined the right tree, for it is not in proof they were ever there with Davis.

Litton is a competent witness, or he would have been excepted to as John Martin was, and his testimony strengthens that of Davis. Besides by Steele's plat which is the only one on which the water courses are laid down from actual survey, it appears there is a horse shoe bend in the creek at Berry's improvement.

As to the second objection: It is settled by the case of *Consilla* v. *Briscoe.*

There the commissioners having certified that the improvement was made in 1775, although the proof was of making it in 1776, the court said they must consider the improvement as having been proved to have been made in 1775.

So here the court will take the certificate as proof that our improvement was made in March. It is the spot only it is necessary to show, the making the improvement is proved by the certificate.

⸳In the case of *Myers* v. *Speed*, the court would not presume what they must have known, that the commissioners granted to Edward Davis a pre-emption for an improvement made for him by Azel Davis and David Findley; and it is contended, that in this case as the improvement we show is said to have been made in May, the court ought not to presume it to be the improvement for which the certificate was granted, and this it is said is not impeaching the certificate.

It is true, it is not directly impeaching it, but it is indirectly destroying it, and such was the case in *Myers* v. *Speed*.

There can be no doubt, no one does doubt, that this certificate was granted to Berry for making what was called a tomahawk improvement, and it is admitted that no inquiry ought now to be made, whether the commissioners ought to have granted their certificate for such a service.

So that it is contended the court ought (while it is admitted they have no power over the commissioners' acts) to prevent the effect of their certificate on a difference of opinion as to the construction of the law.

But this question can not at all events be inquired into here, for the complainant alleged in his bill, that he made an actual settlement in March, 1779, the defendant admits it, but denies this to be the place.

If claims of this description are to be lost, because the improvements were not notorious, we can only lament it. But confident we are that neither the letter or the spirit of the land law required that notoriety.

BY THE COURT.—In this cause it appears, that the appellant has relied solely on his legal title to the land in contest, which was obtained subsequent to the certificate from the commissioners on which the appellee founds his claim. So that if the locations contained in his certificate from the commissioners, and his entry with the surveyor, do in substance agree, and are such as the land law requires, his claim ought to prevail.

To these points, therefore, the court has principally directed its inquiries; and the court finds that it is not necessary to determine whether the locations of the appellee do, or do not agree

with each other; inasmuch as on consideration of the testimony adduced none of the precise calls in those locations seems to be satisfactorily identified, which is essential to a claim depending on a location made with a surveyor, if not to one made with the commissioners.

But be this as it may, the court is decidedly of opinion, that the place shown for the improvement of the appellee as called for in his locations, had not that notoriety when the locations were made, which the land law and the reason of the case requires. And as none of the other calls therein, are in themselves precise and unequivocal, that the appellee hath not made out either a legal or equitable right to recover any land from the appellant. Wherefore, it is decreed and ordered that the decree of the court for the said district in the said cause rendered, be reversed and held for naught, with costs, etc.

NOTE.—An attempt was made in this cause to impeach the character of Richard Davis, which produced a great many depositions to contradict the facts with which he was charged, which they did completely and satisfactorily.

The depositions together with that of the witness who impeached Davis' character are omitted, because the attempt was unsuccessful, and the charge not insisted upon at the trial.